**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| HEARTLAND MEMORIAL HOSPITAL, LLC, an | ) | Case No. 07-20188-JPK |
| Indiana limited liability company, | ) | Chapter 11 |
| | ) | |
| Debtor, | ) | Hon. J. Philip Klingeberger |
| | ) | |
| | ) | |
| DAVID ABRAMS, not individually but solely as the | ) | |
| Liquidating Trustee and court-appointed manager of | ) | |
| HEARTLAND MEMORIAL HOSPITAL, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Adv. No. |
| | ) | |
| v. | ) | |
| | ) | |
| MUNSTER MEDICAL HOLDINGS, LLC, an | ) | |
| Indiana limited liability company, ELIZA | ) | |
| INVESTMENTS, LLC, an Indiana limited liability | ) | |
| company, NEIL FRIBLEY, an individual, | ) | |
| FRIBLEY & ASSOCIATES, LLC, an Indiana | ) | |
| limited liability company, EDWARD KRUSA, an | ) | |
| individual, THOMAS McDERMOTT, SR., | ) | |
| an individual, VIJAY PATEL, an individual, | ) | |
| MICHAEL W. BACK, an individual, MICHAEL W. | ) | |
| BACK, P.C., an Indiana professional corporation, | ) | |
| and JEFFREY YESSENOW, an individual, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**COMPLAINT TO AVOID AND RECOVER
AVOIDABLE TRANSFERS AND FOR OTHER RELIEF**

David Abrams (the "Plaintiff"), in his capacity as the "Liquidating Trustee" (as defined

herein) and the court-appointed manager of Heartland Memorial Hospital, LLC ("Debtor" or

"Heartland"), pursuant to Sections 544, 547, 548 and 550 of the United States Bankruptcy Code

(the "Bankruptcy Code") and Rule 7001(1) of the Federal Rules of Bankruptcy Procedure (the

"Rules"), brings this adversary proceeding to avoid, set aside and recover certain fraudulent transfers and preferences.  In support thereof, the Plaintiff states as follows:

## INTRODUCTION

1.      From approximately 2002 until 2004, Heartland undertook the development and construction of a 55-bed ambulatory care facility located at 701 Superior Street in Munster, Indiana, ("the Munster hospital facility").  When completed, the Munster hospital facility was to become the main focus of Heartland's business activities.  Unfortunately for the majority of its creditors, Heartland lacked sufficient capital to complete the construction and, at all relevant times, was insolvent.  Notwithstanding its insolvency, Heartland engaged in a number of transactions which allowed insiders to receive monetary benefits to the detriment of Heartland's creditors.  This lawsuit attempts to recover these fraudulent transfers which relate to the Munster hospital facility.

## JURISDICTION AND VENUE

2.      Debtor is an Indiana limited liability company, formerly operating as a surgery center and hospital located at 701 Superior Street, Munster, Indiana 46321.

3.      On January 31, 2007 (the "Petition Date"), certain petitioning creditors filed an involuntary Chapter 7 petition under the Bankruptcy Code against Debtor.

4.      On March 2, 2007, this Court entered an order for relief against Debtor and granted Debtor's request to convert the Chapter 7 case to a case under Chapter 11 of the Bankruptcy Code.  Upon the conversion to a Chapter 11 case, pursuant to Sections 1107 and 1108 of the Bankruptcy Code, Debtor was authorized to operate its business as debtor-in-possession.

5.      The United States District Court, pursuant to 28 U.S.C. § 1334, has original and exclusive jurisdiction over all cases under the Bankruptcy Code, as well as original but not exclusive, jurisdiction over all proceedings arising under the Bankruptcy Code, or arising in or related to cases under the Bankruptcy Code.

6.      Pursuant to 28 U.S.C. § 157(a), the District Court may refer to the bankruptcy judges for the district any and all cases under the Bankruptcy Code and any and all proceedings arising in, arising under, or related to a case under the Bankruptcy Code.

7.      The United States District Court for the Northern District of Indiana has, pursuant to Local Rule 200.1 (L.R. 200.1), provided for the referral of all bankruptcy cases, and all related adversary proceedings, to the United States Bankruptcy Court for the Northern District of Indiana.

8.      On or about November 19, 2008, the Court entered an order (the "Confirmation Order") confirming a Liquidating Plan of Reorganization filed on August 1, 2008, as amended by the First Addendum to Liquidating Plan of Reorganization filed October 9, 2008 (collectively referred to as the "Plan").

9.      Pursuant to the terms of the Plan and the Confirmation Order, the Plaintiff, David Abrams, was appointed the Liquidating Trustee (the "Liquidating Trustee") and the court-appointed manager of the Debtor.

10.     The Plan and the Confirmation Order provided that the United States Bankruptcy Court for the Northern District of Indiana retained jurisdiction pursuant to the terms of the Plan and the Confirmation Order to resolve this adversary proceeding.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1409.

12.     As required by Rule 7004 of the Federal Rules of Bankruptcy Procedure, the Trustee states that this Adversary Complaint is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (F), (H) and (O).  To the extent that any of the causes of action are "non-core, related proceedings" or are determined to be such, the Plaintiff consents to entry of final orders or judgments by the Bankruptcy Judge in connection herewith.

## PARTIES

13.     Plaintiff, David Abrams, not Individually but Solely as the Liquidating Trustee and Court-Appointed Manager of Heartland Memorial Hospital, LLC, is an individual whose office address is 39 South LaSalle Street, Chicago, Illinois 60603.

14.     Defendant, Mr. Michael W. Back, is an individual and he resides at 367 W 550, Valparaiso, Indiana.

15.     Defendant, Michael W. Back, PC, is an Indiana professional corporation owned by Defendant, Michael W. Back and it is located at One Professional Center, Suite 204, Crown Point, Indiana 46307.

16.     Defendant, Eliza Investments, LLC, is an Indiana limited liability company and its registered agent is Elizabeth J. Fribley, 9223 Broadway, Suite E, Merrillville, Indiana 46410.

17.     Defendant, Mr. Edward Krusa, is an individual and he resides at 100 Diana Road, Portage, Indiana.

18.     Defendant, Mr. Thomas McDermott, Sr.. is an individual and he resides at 1150 Churchill Lane, Crown Point, Indiana 46307-5068.

19.     Defendant, Munster Medical Holdings, LLC is an Indiana limited liability company and its registered agent is Neil W. Fribley, 9223 Broadway, Suite E, Merrillville, Indiana 46410.

4

20.    Defendant, Vijay Patel, M.D. is an individual and he resides at 8832 Taggart Drive, Camby, Indiana.

21.    Defendant, Fribley & Associates, LLC is an Indiana limited liability company and its registered agent is Neil W. Fribley, 9223 Broadway, Ste E, Merrillville, Indiana 46410

22.    Defendant, Neil W. Fribley is an individual and he resides at 10046 Fillmore Ct, Crown Point, Indiana.

23.    Defendant, Jeffrey Yessenow, M.D. is an individual and he resides at 9250 Columbia Ave, Munster, Indiana or 808 Killarney Dr. Dyer, Indiana.

## BACKGROUND

### History of Heartland Memorial Hospital, LLC

24.    Illiana Surgery Center, L.L.C.  ("ISC") was organized as an Indiana limited liability company on or about February 16, 1999.

25.    On or about March 16, 1999, ISC renamed itself Illiana Surgery and Medical Center, L.L.C.  ("Illiana").

26.    On or about May 18, 2006, Illiana renamed itself Heartland Memorial Hospital, LLC ("Heartland").

27.    iHealthcare, Inc., is an Indiana corporation ("iHealthcare") and was formed on or about June 6, 2002 and was the sole owner of the equity of Heartland.

28.    Throughout its history, Heartland operated a number of for-profit, physician owned, healthcare practices in Indiana and Illinois.

29.    From 2004 until approximately October of 2005, Heartland's business affairs were managed by the directors of iHealthcare through a management committee for Heartland, comprised of Vijay Gupta, M.D., Harold B. Collins, Karen Briggs, D.O., Mark Efrusy, D.O.,

Ramon Halum, M.D., John Kniaz, D.O., David Ray, D.P.M., Jagdish Patel, M.D., Vijay Patel, M.D., Shaun Kondamuri, M.D., Randall Morgan, Jr., M.D., Jeffrey Yessenow, M.D., and Thomas McDermott, Sr. (hereinafter, collectively referred as "the Old Management").

30.    From October of 2005, Heartland was managed by Jeffrey Yessenow, Hilton Hudson and Paul Jones, as well as Wright and Sharp (collectively, "the New Management")

**The First Sale and Leaseback to Munster Medical Holdings, LLC.**

31.    Munster Medical Holdings, L.L.C. ("Munster Holdings"), an Indiana limited liability company, was formed on January 27, 2004.

32.    Initially, the members of Munster Holdings were Thomas McDermott, Sr. and Neil Fribley, individually, and through an investment entity known as Eliza Investments (Neil Fribley and Eliza Investments shall collectively be referred to as "Fribley").

33.    Upon information and belief, McDermott and Fribley each initially owned 50% of the equity of Munster Holdings.

34.    It appears that sometime prior to March 16, 2004, McDermott made one or more advances to Heartland.  These advances totaled approximately $2.5 million.

35.    This purported debt was evidenced by a $2,533,795.00 promissory note dated as of March 16, 2004, which was executed by Heartland in favor of McDermott.

36.    On or about August 30, 2004, Heartland entered into a "sale/leaseback" agreement with Munster Holdings.  Under the terms of this agreement, Heartland agreed to sell its Munster hospital facility to Munster Holdings for the sum of $30 million dollars.  Heartland agreed to then lease the Munster hospital facility from Munster Holdings pursuant to a long-term lease. The base rent under this lease was $298,723 a month for the first five years.

37.    Upon information and belief, on or about August 30, 2004, McDermott contributed his Heartland promissory note to Munster Holdings.  In return, McDermott apparently received a 27.5% interest in Munster Holdings.

38.    Upon information and belief, on or about August 30, 2004, Yessenow received a 20% interest in Munster Holdings, in exchange for a contribution to Munster Holdings which was allegedly valued to be $2,000,000.

39.    Upon information and belief, on or about August 30, 2004, Fribley, received a 22.5% interest in Munster Holdings, in exchange for a $500 contribution.

40.    Upon information and belief, on or about August 30, 2004, Ed Krusa received a 5% ownership interest in Munster Holdings, in exchange for the contribution of certain "services" rendered to Munster Holdings.

41.    In addition, under the terms of the sale/leaseback agreement, Heartland, was to receive, at closing, a 25% interest in Munster Holdings.

42.    In order to fund a portion of the $30 million purchase price, Munster Holdings arranged for a $25,500,000 loan from GE Capital, repayment of which was secured by a lien on the Munster hospital facility.

43.    The sale/leaseback transaction between Heartland and Munster Holdings ("the Munster Holdings transaction") closed on or about December 22, 2004.

44.    Upon information and belief, some or all of the remaining consideration paid to Heartland was in the form of the forgiveness of debt allegedly owed by Heartland to McDermott and Yessenow.

45.    Heartland retained the right and option to repurchase the real estate upon the terms of the purchase option set forth in the purchase agreement.  Heartland could purchase the

real estate for the sum of $30 million dollars plus certain additional items including a cost of living increase and an agreement to provide Munster Holdings a guaranteed return on its equity in the amount of 12%, if such option were exercised before October 1, 2009.

46.     Upon information and belief, additional parties were given equity interests in Munster Holdings during the time Munster Holdings owned the Munster hospital facility including, without limitation, Vijay Patel and Jagdish Patel.

47.     Later, in December, 2005, McDermott sold or transferred his 27.5% interest in Munster Holdings to Heartland, in exchange for 75% of Heartland's ownership interest in a wholly-owned subsidiary of Heartland known as Broadwest Surgery Center, thereby increasing Heartland's ownership of Munster Holdings to 52.5%.

48.     In addition, upon information and belief, Jagdish Patel acquired 6.25% of Munster Holdings.  At some point thereafter, he transferred the interest to Heartland, thereby increasing Heartland's interest in Munster Holdings to 58.75%.

49.     The effect of the Munster Holdings transaction was, on information and belief, to render Heartland insolvent.  The Munster Holdings transaction stripped Heartland of its major asset, leaving it with a disproportionately small equity interest in Munster Holdings, but obligating Heartland to pay a liability in the form of monthly lease payments of approximately $298,723 per month to Munster Holdings, which lease payments were burdensome and detrimental to Heartland's best interests.

**Old Management Cedes Management Control to Unqualified Managers**

50.     After the closing of the Munster Holdings transaction, Heartland continued to suffer losses, and was having difficulty paying its creditors.  For example, Heartland failed to pay approximately $900,000 in employee withholding taxes owed to the Internal Revenue

Service and the Indiana Department of Revenue for the period from April, 2005 until October, 2005.

51.    In early 2005, Heartland, through Gupta and Collins, embarked on an effort to locate a buyer for Heartland's assets and/or their equity interest in iHealthcare.  Eventually, Heartland located such a buyer, Wright Capital Partners, a purported investment banking firm.

52.    Upon information and belief, Wright Capital Partners was owned and controlled by Leroy Wright.  Alfred Sharp and Allen Hill had an employment relationship with Wright Capital Partners or Leroy Wright.

53.    Already insolvent, Heartland's financial condition continued to worsen.  In October, 2005, Heartland required an immediate equity infusion in order to continue to operate.

54.    Leroy Wright and his business associates, Alfred Sharp and Allen Hill of Wright Capital Partners, expressed a strong desire to purchase the equity in iHealthcare from its shareholders, which included Old Management, including Collins and Gupta.

55.    iHealthcare was at all relevant times the sole member of Heartland.

56.    In October, 2005, Wright Capital Partners offered to lend Heartland up to $2.5 million dollars, provided however, that Wright, Sharp and Hill were placed in immediate control of Heartland.

57.    The Old Management agreed, without due regard to the best interests of Heartland and its creditors, to place Wright, Sharp and Hill in control of Heartland's management, including complete control over its finances.

## Sale of Equity in iHealthcare to Wright Capital Partners

58.     In October, 2005, the shareholders of iHealthcare, including the Old Management, agreed to sell their individual shares in iHealthcare to Wright Capital Partners for approximately $25 million dollars.

59.     iHealthcare's shareholders and Wright Capital Partners entered into a stock purchase transaction in the fall of 2005.  However, the transaction was not consummated because Wright Capital Partners lacked the necessary funds to do so.

60.     As a result, the parties began a series of negotiations which resulted in a revised purchase agreement.  This amended purchase agreement was closed on or about March 24, 2006.

61.     The sale of the equity interests in iHealthcare was accomplished through a "leveraged finance transaction" or "leveraged buy-out transaction" in which Heartland entered into a sale/leaseback transaction.  Heartland then, through a series of transactions, caused the sale proceeds to be paid to the Old Management in exchange for Old Management transferring their ownership interest in iHealthcare to Wright Capital Partners, or its nominee.

62.     In effect, Wright Capital Partners purchased Heartland with the proceeds from the sale of Heartland's own assets.

63.     As a result of such sale, Gupta and Collins together received a total of approximately $2.5 million dollars out of the approximately $7.3 million dollars paid to the selling shareholders of iHealthcare.

## The AIC Sale/Leaseback Transaction

64.     Wright, Sharp and Hill were able to raise the funds to pay to the iHealthcare shareholders by selling Heartland's ancillary real estate assets and then causing Heartland to lease these assets back from the purchaser (the "AIC/Leaseback transaction").

65.     Wright Capital Partners, Wright, Sharp and/or Hill formed Wright Health Systems, Inc., a Maryland corporation ("WSI") on or about September 28, 2005.  WSI changed its name to TWG Illiana Surgery and Medical Center, Inc. ("TWG") on or about April 25, 2006.  TWG changed its name to Heartland Memorial Holdings, Inc. ("Holdings") on or about September 12, 2006.

66.     Upon information and belief, Heartland entered into a transaction with NL Venture V, LP, acting on behalf of AIC Holding V, LLP (hereinafter "AIC") whereby AIC agreed to purchase substantially all of Heartland's "ancillary" real estate assets  for $19 million.  These "ancillary" real estate assets consist of certain physician practices commonly referred to as Justice, Broadway, 89th Avenue, 9132 Munster, 9136 Munster and Schererville.  Simultaneously, AIC entered into a lease agreement with Heartland for these properties for a monthly rental of approximately $163,000 per month.

67.     Of the $19 million in proceeds generated by this sale-leaseback, approximately $650,000 was paid to AIC in the form of fees, and the sum of approximately $382,000 was paid to TWG/Wright Capital Partners' legal counsel, the law firm of DLA Piper USA, LLP.

68.     Approximately $7.3 million dollars of the sale proceeds was distributed to the selling shareholders of iHealthcare.

69.     The Old Management knew and should have known that the aforesaid finance transaction ("the AIC transaction") was entered into by Heartland not for the benefit of Heartland and its creditors, but for the specific benefit of the Old Management, the owners of iHealthcare.  This transaction enriched the Old Management at the direct expense of Heartland and its creditors.

11

70.    When the Old Management allowed Wright, Hill, Sharp, TWG and Wright Capital Partners to usurp the  management of Heartland, the Old Management failed to properly monitor Heartland including, for example, Heartland's continuing failure to pay employee withholding taxes owed by Heartland to the Internal Revenue Service and the Indiana Department of Revenue.

71.    The Old Management's abdication of control of Heartland, in favor of Wright, Hill and Sharp, resulted in Heartland entering into the AIC transaction, which resulted in Heartland selling assets to raise funds for distributions to the members of Old Management, while Heartland was insolvent, to the detriment of Heartland's creditors.

72.    The AIC transaction resulted in the transfer of approximately $7.3 million dollars of Heartland's assets to the equity owners of iHealthcare (including the Old Management). Heartland was left in an untenable financial posture, bereft of assets and consumed by liabilities.

**Further Deterioration of Heartland's Finances in the Hands of Heartland's New Management**

73.    Upon the closing of the AIC transaction, on or about March 24, 2006, Heartland was managed by Jeffrey Yessenow, Hilton Hudson and Paul Jones, as well as Wright and Sharp (collectively, "the New Management").

74.    New Management assumed complete control over the management and business affairs of Heartland.  However, the financial deterioration of Heartland continued under New Management.

75.    For example, New Management continued the failure to pay employee withholding taxes to the Internal Revenue Service and the Indiana Department of Revenue. Heartland allowed these obligations to increase to $4 million to the Internal Revenue Service and $500,000 to the Indiana Department of Revenue.

12

76.     Notwithstanding Heartland's precarious financial position, New Management allowed, authorized or permitted Heartland to pay Wright, Sharp and/or Wright Capital Partners not less than $500,000.

77.     As noted above, New Management also authorized payment to Wright's legal advisors, DLA Piper USA, LLP, in the amount of not less than $382,000 on or about March 24, 2006, with regard to the representation of Wright Capital Partners, not Heartland, in the AIC transaction.

78.     In November, 2006, New Management allowed, authorized or permitted Heartland to pay $300,000 to Wright Capital Partners in order to allow Holdings to redeem Wright Capital Partners', Wright's and/or Sharp's equity interest in Holdings.

79.     New Management permitted Heartland's finances to further deteriorate to such a point that Heartland repeatedly failed to pay vendors, allowed judgments to be taken against Heartland and permitted judgment liens to be recorded against Heartland's assets.  Nevertheless, in an effort to maintain the facade that it was still a viable entity, New Management allowed Heartland to borrow money from various lenders, including not less than $3.0 Million from private individuals.

80.     New Management knew or should have known that Heartland could not repay this additional indebtedness obtained from a variety of private individuals.

81.     Ultimately, New Management, faced with unyielding financial pressure, resorted to a sale-leaseback involving Heartland's only significant remaining asset, its 52.5% interest in Munster Holdings and the Munster hospital facility.

**The SSFHS Transaction**

82.     On October 31, 2006, Heartland and Munster Holdings sold the Munster hospital facility and most of its operating equipment to the Sisters of St. Francis Health Services ("SSFHS"), for the sum of $42.8 million dollars.  As a result of that transaction, Heartland received $42.8 million dollars, much of which was paid to lenders which had security interests in Heartland's assets or liens on the Munster hospital facility.

83.     As was its pattern, Heartland agreed to lease back the facility and the operating equipment from SSFHS ("the SSFHS Sale/Leaseback transaction").

84.     The SSFHS Sale/Leaseback transaction was not in the best interests of Heartland or its creditors for several reasons.

85.     Heartland lacked sufficient funds to afford the monthly lease payments amounting to approximately $500,000 per month under the lease with SSFHS.

86.     In addition, New Management allowed, authorized or permitted the majority – if not all – of the available sale proceeds (after the payment of mortgages) from the SSFHS Sale/Leaseback transaction to be allocated to Munster Holdings, but allowed Heartland to assume all of the obligations under the lease with SSFHS.

87.     Upon information and belief, New Management allowed, authorized or permitted Heartland to transfer at least 17.5% of its interest in Munster Holdings to Yessenow.  As a result, Yessenow acquired 37.5% of Munster Holdings, which resulted in distribution to him of $2.2 million dollars from the SSFHS Sale/Leaseback transaction.

88.     Certain proceeds of the SSFHS Sale/Leaseback transaction were distributed as follows:

| | |
|---|---|
| Michael W. Back, P.C.<br>(Munster Holdings attorney) | $  110,473.00 |
| Eliza Investments, LLC<br>(Munster Holdings Member) | 1,682,084.00 |
| Fribley & Associates, LLC<br>(Munster Holdings Member) | 280,000.00 |
| Vijay Patel<br>(Munster Holdings Member) | 2,240,656.00 |
| Chicago Title & Trust Company<br>Escrow# 26066063-002<br>(Munster Holdings Member)<br>For benefit of Vijay Patel | 366,677.00 |
| Edward Krusa<br>(Munster Holdings Member) | 504,280.00 |
| Thomas McDermott, Sr.<br>(purported Munster Holdings Member) | 143,406.00 |
| Jeffrey Yessenow<br>(Munster Holdings Member) | 2,214,647.00 |
| **TOTAL** | **$7,542,223.00** |

89.     Heartland received a disproportionately small portion of the proceeds from the SSFHS Sale/Leaseback transaction due to the decision regarding the allocation of the purchase price between Heartland and Munster Holdings.

90.     This misallocation of sale proceeds was further exacerbated by the Heartland's decision, made prior to or at the closing of the SSFHS Sale/Leaseback transaction, to transfer some or all of its 58.75% interest in Munster Holdings to McDermott, Yessenow and others.

91.     As a result of these transfers and the apparent consent to the allocation of the purchase price between Heartland and Munster Holdings, Heartland was deprived of its rightful share of the proceeds of the SSFHS Sale/Leaseback transaction.

## COUNT I

### Liquidation Trustee's Claims Against Defendants Under §544 of the Bankruptcy Code and I.C. 32-18-2-14 of the IUFTA

92.     The Liquidating Trustee incorporates and realleges paragraphs 1 through 88 of this Complaint as paragraph 89 as if fully set forth herein.

93.     As more fully alleged above, Heartland transferred to the Defendants: (a) the Munster hospital facility to Munster Holdings for the benefit of the Defendants; (b) lease payments to Munster Holdings pursuant to lease the Munster hospital facility for the benefit of the Defendants; (c) Heartland's membership interest in Munster Holdings to various Defendants, including, without limitation, Yessenow and McDermott; (d) Broadwest Surgery Center to McDermott; and (e) Heartland's share of the SSFHS Sale/Leaseback transaction sale proceeds to be distributed to Munster Holdings and its members.

94.     The transfers constituted a transfer of Heartland's property and the incurring of an obligation of Heartland within four years of the Petition Date.

95.     Heartland did not receive reasonably equivalent value in exchange for its transfer of the Munster Hospital Facility to Munster Holdings.

96.     After Heartland entered into the transaction, Heartland:

a.      was engaged in business for which Heartland's remaining property was unreasonably small capital; or

b.      intended to incur, believed or reasonably should have believed that it would incur debts that would be beyond its ability to pay as such debts matured.

16

97.     Section 544 of the Bankruptcy Code and I.C. 32-18-2-14 of the IUFTA permit the Liquidation Trust to avoid the transfer.

98.     Section 550(a) of the Bankruptcy Code permits the Liquidation Trust to recover the property transferred to the Defendants or for their benefit, or the value of such property.

**WHEREFORE**, the Liquidating Trustee requests that the Court enter judgment in favor of the Liquidating Trust and against the Defendants:

A.      Avoiding the transfers;

B.      Entering judgment against the Defendants and in favor of the Liquidation Trust under section 544 of the Bankruptcy Code and I.C. 32-18-2-14 of the IUFTA;

C.      Authorizing the Liquidating Trustee to recover the transfers from the initial transferee or any immediate or mediate transferee of the initial transferee pursuant to 11 U.S.C. § 550(a);

D.      Awarding the Liquidation Trustee his reasonable costs and attorneys' fees; and

E.      For such other relief as the Court deems just and proper.

## COUNT II

### Liquidation Trustee's Claims Against Defendants Under §544 of the Bankruptcy Code and I.C. 32-18-2-15 of the IUFTA

99.     The Liquidating Trustee incorporates and realleges paragraphs 1 through 88 of this Complaint as paragraph 96 as if fully set forth herein.

100.    As more fully alleged above, Heartland transferred to the Defendants: (a) the Munster hospital facility to Munster Holdings for the benefit of the Defendants; (b) lease payments to Munster Holdings pursuant to lease the Munster hospital facility for the benefit of the Defendants; (c) Heartland's membership interest in Munster Holdings to various Defendants, including, without limitation, Yessenow and McDermott; (d) Broadwest Surgery Center to

17

McDermott; and (e) Heartland's share of the SSFHS Sale/Leaseback transaction sale proceeds to Munster Holdings and its members.

101.    At least one creditor of Heartland was a creditor of Heartland at the time of the transfers.

102.    The transfers constituted a transfer of Heartland's property and the incurring of an obligation of Heartland within four years of the Petition Date.

103.    Heartland did not receive reasonably equivalent value in exchange for its transfer of the Munster Hospital Facility to Munster Holdings.

104.    On the date that Heartland entered into the transaction, Heartland was insolvent or became insolvent as a result of incurring such obligations or making of such transfers.

105.    Section 544 of the Bankruptcy Code and I.C. 32-18-2-15 of the Indiana Uniform Fraudulent Transfer Act, I.C. 32-18-2-1, et seq. ("IUFTA") permit the Liquidating Trustee to avoid the transfer of the Munster Hospital Facility to Munster Holdings.

106.    Section 550(a) of the Bankruptcy Code permits the Liquidating Trustee to recover the property transferred to the Defendants or for their benefit, or the value of such property.

**WHEREFORE**, the Liquidating Trustee requests that the Court enter judgment in favor of the Liquidating Trustee and against the Defendants:

A.      Avoiding the transfers to the Defendants;

B.      Entering judgment against the Defendants and in favor of the Liquidation Trustee pursuant to 11 U.S.C. § 548(a)(1)(B);

C.      Entering judgment against the Defendants and in favor of the Liquidation Trustee under section 544 of the Bankruptcy Code and I.C. 32-18-2-15 of the IUFTA;

D.     Authorizing the Liquidating Trustee to recover the transfers from the initial transferee or any immediate or mediate transferee of the initial transferee pursuant to 11 U.S.C. § 550(a);

E.     Awarding the Liquidation Trustee his reasonable costs and attorneys' fees; and

F.     For such other relief as the Court deems just and proper.

## COUNT III

### Liquidation Trustee's Claims Against Defendants Under §§ 548 and 550 of the Bankruptcy Code

107.     The Liquidating Trustee incorporates and realleges paragraphs 1 through 88 of this Complaint as paragraph 104 as if fully set forth herein.

108.     As more fully alleged above, Heartland transferred to the Defendants: (a) the Munster hospital facility to Munster Holdings for the benefit of the Defendants; (b) lease payments to Munster Holdings for the benefit of the Defendants; (c) Heartland's membership interest in Munster Holdings to various Defendants, including, without limitation, Yessenow and McDermott; (d) Broadwest Surgery Center to McDermott; and (e) Heartland's share of the SSFHS Sale/Leaseback transaction sale proceeds to Munster Holdings and its members.

109.     Heartland permitted the SSFHS Sale/Leaseback transaction sale proceeds to be distributed to Munster Holdings and its members.

110.     Pursuant to 11 U.S.C. § 548, a trustee may avoid any transfer made or obligation incurred, during the two year prior to the filing of a petition, where the debtor received less than a reasonably equivalent value in exchange for such transfer or obligation, and (i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; (ii) was engaged in a business or a transaction, or was about to engage in business or transaction, for which any property remaining with the debtor was an

unreasonably small capital; or (iii) intended to incur, or believed that the he would incur, debts that would be beyond his ability to pay as such debts matured.

111.    The transfers occurred within two years of the Petition Date.

112.    Heartland received less than a reasonably equivalent value in exchange for the transfers.

113.    On information and belief, at the time of the transfers, Heartland was insolvent, was engaged or was about to engage in a business or transaction for which the Heartland's remaining assets were unreasonably small in relation to the business or transaction, and/or intended to incur, or believed or reasonably should have believed that he would incur debts beyond his ability to pay as they became due.

**WHEREFORE**, the Liquidating Trustee requests that the Court enter judgment in favor of the Liquidating Trustee and against the Defendants:

A.  Avoiding the transfers to the Defendants;

B.  Entering judgment against the Defendants and in favor of the Liquidation Trustee pursuant to 11 U.S.C. § 548(a)(1)(B);

C.  Authorizing the Liquidating Trustee to recover the transfers from the initial transferee or any immediate or mediate transferee of the initial transferee pursuant to 11 U.S.C. § 550(a);

D.  Awarding the Liquidation Trustee his reasonable costs and attorneys' fees; and

E.  For such other relief as the Court deems just and proper.

**COUNT IV**

**Liquidating Trustee's Claims to Avoid Transfers to Munster Holdings, Back
Fribley, Krusa, McDermott, V. Patel, And Yessenow
Under Section 547 of the Bankruptcy Code**

114.    Plaintiff realleges and incorporates by reference the allegations set forth in
paragraphs 1-88 as if more fully set forth herein.

115.    Plaintiff seeks to avoid certain preferential transfers made by Heartland during the
ninety-day period preceding the Petition Date (the "Preference Period"), during the one-year
period preceding the Petition Date (the "Insider Preference Period") and to recover from Munster
Holdings, Fribley Krusa, McDermott, V. Patel, and Yessenow the amount of such preferential
transfers, plus interest where applicable.  This proceeding also seeks disallowance of any claim
filed by Defendant pursuant to Section 502(d) of the Bankruptcy Code.

116.    During the Preference and Insider Preference Period, Heartland made transfers to
the Munster Holdings, Back, Fribley, Krusa, McDermott, V. Patel, and/or Yessenow including,
without limitation, the transfer of Heartland's interest in Munster Holdings, the proceeds
associated with the membership interest in Munster Holdings and the proceeds of the SSFHS
Sale/Leaseback which were distributed to these defendants (collectively, "the Preferential
Transfers").

117.    The Preferential Transfers were to or for the benefit of Munster Holdings, Back,
Fribley, Krusa, McDermott, V. Patel, and/or Yessenow.

118.    At the time of the Preferential Transfers, Munster Holdings, Back, Fribley, Krusa,
McDermott, V. Patel, and/or Yessenow were an insider under Section 101(31)(B) of the
Bankruptcy Code.

119.    The Preferential Transfers were made on account of an antecedent debt owed by Heartland to the Defendants.

120.    Heartland was insolvent at all times during the one-year period prior to the Petition Date.

121.    The Preferential Transfers allowed the Defendants to receive more than the Defendants would otherwise have received if (a) Heartland's case were one pending under Chapter 7 of the Bankruptcy Code, (b) the Preferential Transfers had not been made, and (c) the Defendants received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

WHEREFORE, the Liquidating Trustee requests that the Court enter judgment in favor of the Liquidating Trust and against Defendants:

A.    Avoiding the transfers to Munster Holdings, Back, Fribley, Krusa, McDermott, V. Patel, and/or Yessenow;

B.    Entering judgment against Munster Holdings, Back, Fribley, Krusa, McDermott, V. Patel, and/or Yessenow and in favor of the Liquidation Trustee pursuant to 11 U.S.C. § 547(b);

C.    Authorizing the Liquidating Trustee to recover the transfers from the initial transferee or any immediate or mediate transferee of the initial transferee pursuant to 11 U.S.C. § 550(a);

D.    Disallowing any claim filed by Munster Holdings, Back, Fribley, Krusa, McDermott, V. Patel, and/or Yessenow pursuant to Section 502(d) of the Bankruptcy Code;

E.    Awarding the Liquidation Trustee his reasonable costs and attorneys' fees; and

F.    For such other relief as the Court deems just and proper.

Dated:  February 28, 2009.

DAVID ABRAMS, NOT INDIVIDUALLY BUT
SOLELY AS THE LIQUIDATING TRUSTEE
AND COURT-APPOINTED MANAGER OF
HEARTLAND MEMORIAL HOSPITAL, LLC

By: */s/ Mark E. Leipold*
                    One of his Attorneys

Shawn D. Cox        (I.D. #20074-45)
Gordon E. Gouveia (I.D. #7235-45)
GOUVEIA & ASSOCIATES
433 West 84th Drive
Merrillville, IN 46410
Telephone:  219.736.6020
Facsimile:  219.736.2545

Christopher J. Horvay (I.D. #1263315
Mark E. Leipold        (I.D. #6194124)
GOULD & RATNER LLP
222 North LaSalle Street, Suite 800
Chicago, IL 60601
Telephone:  312.236.3003
Facsimile:  312.236.3241